COMMERCE & INDUSTRY INSURANCE COMPANY & others[1] *vs.*
BAYER CORPORATION.

Essex. January 8, 2001. - February 21, 2001.

Present: GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Contract,* Arbitration, Standard forms, Offer and acceptance. *Sale,* Acceptance of goods, Contract of sale.

Discussion of G. L. c. 106, § 2-207, enacted with the expectation of creating an orderly mechanism to resolve commercial contract disputes resulting from a "battle of the forms." [391-393]

In a contract action, a Superior Court judge correctly denied the defendants' motion to compel arbitration and stay the proceedings, where the terms of the contract were not formed by the parties' writings, of which the plaintiffs' but not the defendants' included an arbitration provision, but rather were formed under G. L. c. 106, § 2-207(3), by the parties' conduct and the terms on which the parties agreed. [393-397]

In a contract action, the plaintiffs were not estopped from refusing arbitration, where the defendants did not demonstrate that the plaintiffs intended to be bound by an arbitration provision in the absence of a final written contract between the parties. [397-398]

CIVIL ACTION commenced in the Superior Court Department on December 3, 1998.

A motion to compel arbitration and to stay further litigation was heard by *S. Jane Haggerty,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Brian A. Davis* (*Laurence D. Pierce* with him) for the defendant.

*Thomas J. Sartory* (*Julie A. Frohlich & Arthur E. Maravelis* with him) for the plaintiffs.

GREANEY, J. We granted the application for direct appellate review of the defendant, Bayer Corporation (Bayer), to determine the enforceability of an arbitration provision appearing in the plaintiff's, Malden Mills Industries, Inc. (Malden

---

[1]Federal Insurance Company and Malden Mills Industries, Inc.

Mills), orders purchasing materials from Bayer. In a written decision, a judge in the Superior Court concluded that the provision was not enforceable. An order entered denying Bayer's motion to compel arbitration and to stay further litigation against it.[2] We affirm the order.

The background of the case is as follows. Malden Mills manufactures internationally-known apparel fabrics and other textiles. On December 11, 1995, an explosion and fire destroyed several Malden Mills's buildings at its manufacturing facility. Subsequently, Malden Mills and its property insurers, the plaintiffs Commerce and Industry Insurance Company and Federal Insurance Company, commenced suit in the Superior Court against numerous defendants, including Bayer. In their complaint, the plaintiffs allege, insofar as relevant here, that the cause of the fire was the ignition, by static electrical discharge, of nylon tow (also known as bulk nylon fiber), which was sold by Bayer (but manufactured by a French business entity) to Malden Mills and used by Malden Mills to manufacture "flocked fabric," a fabric used primarily for upholstery application.[3]

Malden Mills initiated purchases of nylon tow from Bayer either by sending its standard form purchase order to Bayer, or by placing a telephone order to Bayer, followed by a standard form purchase order. Each of Malden Mills's purchase orders contained, on the reverse side, as one of its "terms and conditions," an arbitration provision stating:

> "Any controversy arising out of or relating to this contract shall be settled by arbitration in the City of New York or Boston as [Malden Mills] shall determine in accordance with the Rules then obtaining of the American Arbitration Association or the General Arbitration Council of the Textile Industry, as [Malden Mills] shall determine."

Another "term and condition" appearing in paragraph one on the reverse side of each purchase order provides:

> "This purchase order represents the entire agreement between both parties, not withstanding any Seller's order

---

[2]An order denying a motion to compel arbitration is immediately appealable under G. L. c. 251, § 18 (*a*) (1).

[3]The plaintiffs' claims against Bayer allege negligence and breach of implied warranties of merchantability and of fitness for a particular purpose.

form, whether sent before or after the sending of this purchase order, and this document cannot be modified except in writing and signed by an authorized representative of the buyer."

In response, Bayer transmitted Malden Mills's purchase orders to the manufacturer with instructions, in most instances, that the nylon tow was to be shipped directly to Malden Mills. Thereafter, Bayer prepared and sent Malden Mills an invoice. Each of the Bayer invoices contained the following language on its face, located at the bottom of the form in capital letters:

"TERMS AND CONDITIONS: NOTWITHSTANDING ANY CONTRARY OR INCONSISTENT CONDITIONS THAT MAY BE EMBODIED IN YOUR PURCHASE ORDER, YOUR ORDER IS ACCEPTED SUBJECT TO THE PRICES, TERMS AND CONDITIONS OF THE MUTUALLY EXECUTED CONTRACT BETWEEN US, OR, IF NO SUCH CONTRACT EXISTS, YOUR ORDER IS ACCEPTED SUBJECT TO OUR REGULAR SCHEDULED PRICE AND TERMS IN EFFECT AT TIME OF SHIPMENT AND SUBJECT TO THE TERMS AND CONDITIONS PRINTED ON THE REVERSE SIDE HEREOF."

The following "condition" appears in paragraph fourteen on the reverse side of each invoice:

"This document is not an Expression of Acceptance or a Confirmation document as contemplated in Section 2-207 of the Uniform Commercial Code. The acceptance of any order entered by [Malden Mills] is expressly conditioned on [Malden Mills's] assent to any additional or conflicting terms contained herein."

Malden Mills usually remitted payment to Bayer within thirty days of receiving an invoice.

Based on the arbitration provision in Malden Mills's purchase orders, Bayer demanded that Malden Mills arbitrate its claims against Bayer. After Malden Mills refused, Bayer moved to compel arbitration and to stay the litigation against it.[4] The judge denied Bayer's motion, concluding, under § 2-207 of

---

[4]None of the other defendants moved to compel arbitration.

G. L. c. 106 (§ 2-207) (set forth below),[5] the Massachusetts enactment of the Uniform Commercial Code, that the parties' conduct, as opposed to their writings, established a contract. As to whether the arbitration provision was an enforceable term of the parties' contract, the judge concluded that subsection (3) of § 2-207 governed, and, pursuant thereto, the arbitration provision was not enforceable because the parties had not agreed in their writings to arbitrate. Finally, the judge rejected Bayer's argument that the plaintiffs should be equitably estopped from refusing to proceed under the arbitration provision.

1. This case presents a dispute arising from what has been styled a typical "battle of the forms" sale, in which a buyer and a seller each attempt to consummate a commercial transaction through the exchange of self-serving preprinted forms that clash, and contradict each other, on both material and minor terms.

---

[5]General Laws c. 106, § 2-207, inserted by St. 1957, c. 765, § 1, and amended by St. 1991, c. 319, has since remained unchanged. Section 2-207 provides:

> "(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> "(2) The additional or different terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

> "(a) the offer expressly limits acceptance to the terms of the offer;

> "(b) they materially alter it; or

> "(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

> "(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter."

This section varies only slightly from § 2-207 of the Uniform Commercial Code. Subsection (2) of § 2-207 of the Uniform Commercial Code, 1 U.L.A. 376-377 (Master ed. 1989), applies only to "additional terms," whereas subsection (2) of G. L. c. 106, § 2-207, as amended by St. 1991, c. 319, applies to "additional or different terms." See 2 R.A. Anderson, Uniform Commercial Code § 2-207, at 550-551; § 2-207:2, at 559 (3d ed. rev. 1997) (Anderson). Apart from this variation, the sections are identical.

See 1 J.J. White & R.S. Summers, Uniform Commercial Code § 1-3, at 6-7 (4th ed. 1995) (White & Summers). Here, Malden Mills's form, a purchase order, contains an arbitration provision, and Bayer's form, a seller's invoice, is silent on how the parties will resolve any disputes. Oddly enough, the buyer, Malden Mills, the party proposing the arbitration provision, and its insurers, now seek to avoid an arbitral forum.

Section 2-207 was enacted with the expectation of creating an orderly mechanism to resolve commercial disputes resulting from a "battle of the forms."[6] The section has been characterized as "an amphibious tank that was originally designed to fight in the swamps, but was sent to fight in the desert." White & Summers, *supra* at § 1-3, at 8.[7] Section 2-207 sets forth rules and principles concerning contract formation and the procedures for determining the terms of a contract. *Id.* at 9. As to contract formation, under § 2-207, there are essentially three ways by

[6]Section 2-207 was intended to restrict application of the common-law "mirror image" rule to defeat the formation of a contract for the sale of goods. See *JOM, Inc.* v. *Adell Plastics, Inc.*, 193 F.3d 47, 53 (1st Cir. 1999). "Under the common law, the inclusion of an additional term in an acceptance rejected the original offer and constituted a counteroffer which did not become a contract unless it was accepted by the offeror. . . . [Section 2-207] converts what would have been a counteroffer under the common law into an acceptance or confirmation even where the acceptance or confirmation includes additional terms or terms different from those offered or agreed upon." Anderson, *supra* at § 2-207:4, at 560-561. See *Moss* v. *Old Colony Trust Co.*, 246 Mass. 139, 148 (1923).

[7]The tank metaphor was meant to convey the notion that § 2-207 has not worked satisfactorily in practice. Another treatise on the Uniform Commercial Code has been more direct in criticizing § 2-207. "Few provisions of the Code (or indeed of any statute) have gained the notoriety of § 2-207. Scores of cases have explored its every nuance; dozens of law review articles have analyzed its minutiae. A virtual cottage industry has been created to suggest amendments, and agreement is nearly universal that it is at best a 'murky bit of prose.' Its workmanship is further honored by Grant Gilmore's characterization of the provision as 'a miserable, bungled, patched-up job . . . to which various hands . . . contributed at various points, each acting independently of the others (like the blind men and the elephant).' No similar provision exists elsewhere in the Code . . . ." (Footnotes omitted.) 1 T.D. Crandall, M.J. Herbert & L. Lawrence, Uniform Commercial Code § 3.2.4, at 3:12 (1996).

The criticism has not gone unnoticed. The American Law Institute, and the permanent editorial board of the Uniform Commercial Code, have proposed a complete revision of § 2-207 to state new, more simplified, principles to settle contract terms, not just terms as to which there has been a "battle of the forms." See Discussion Draft, Uniform Commercial Code [New] Revised Article 2. Sales at 31-34 (April 14, 2000).

which a contract may be formed. *Id.* at 19-20. See also *JOM, Inc.* v. *Adell Plastics, Inc.*, 193 F.3d 47, 53 (1st Cir. 1999) (*JOM*). "First, if the parties exchange forms with divergent terms, yet the seller's invoice does not state that its acceptance is made 'expressly conditional' on the buyer's assent to any additional or different terms in the invoice, a contract is formed [under subsection (1) of § 2-207]." *Id.* at 53. "Second, if the seller does make its acceptance 'expressly conditional' on the buyer's assent to any additional or divergent terms in the seller's invoice, the invoice is merely a counteroffer, and a contract is formed [under subsection (1) of § 2-207] only when the buyer expresses its affirmative acceptance of the seller's counteroffer." *Id.* Third, "where for any reason the exchange of forms does not result in contract formation (e.g., the buyer 'expressly limits acceptance to the terms of [its offer]' under § 2-207(2)(a), or the buyer does not accept the seller's counteroffer under the second clause of § 2-207[1]), a contract nonetheless is formed [under subsection (3) of § 2-207] if their subsequent conduct — for instance, the seller ships and the buyer accepts the goods — demonstrates that the parties believed that a binding agreement had been formed." *Id.* at 54.

Bayer correctly concedes that its contract with Malden Mills resulted from the parties' conduct, and, thus, was formed pursuant to subsection (3) of § 2-207. A contract never came into being under subsection (1) of § 2-207 because (1) paragraph fourteen on the reverse side of Bayer's invoices expressly conditioned acceptance on Malden Mills's assent to "additional or different" terms,[8] and (2) Malden Mills never expressed "affirmative acceptance" of any of Bayer's invoices. See *id.* at 53. In addition, the exchange of forms between Malden Mills and Bayer did not result in a contract because Malden Mills, by means of language in paragraph one of its purchase orders, expressly limited Bayer's acceptance to the terms of Malden Mills's offers. See G. L. c. 106, § 2-207 (2) (*a*); *JOM, supra* at 54.

---

[8]Bayer's invoices contain terms "additional" and "different" from those in Malden Mills's purchase orders. For example, Bayer's invoices disclaim certain warranties (implied warranties) for which Malden Mills's purchase orders provide. In addition, Bayer's invoices exclude liability for consequential damages for which Malden Mills' purchase orders provide. It cannot be said that these terms are immaterial. See Anderson, *supra* at § 2-207:79, § 2-207:88 (Code is not concerned with presence of additional term unless it is material; limitation of warranties provision and clause excluding liability for consequential damages are material new terms).

Although Bayer acknowledges that its contract with Malden Mills was formed under subsection (3) of § 2-207, it nonetheless argues, relying on language in both *JOM, supra* at 55, and official comment 6 to § 2-207 of the Code, 1 U.L.A. 378 (Master ed. 1989), that the terms of the contract are determined through an application of the principles in subsection (2) of § 2-207. Under this analysis, Bayer asserts that the arbitration provision became part of the parties' contract because it was not a "material alteration," and to include the provision would cause no "surprise or hardship" to the plaintiffs. This analysis is incorrect.

Bayer ignores the significance of the method of contract formation in determining the terms of a contract. See White & Summers, *supra* at § 1-3, at 19-20 (discussing three routes of contract formation under § 2-207, and noting "the terms of any resulting contracts will vary, depending on which route to contract formation a court adopts"). Where a contract is formed by the parties' conduct (as opposed to writings), as is the case here, the terms of the contract are determined exclusively by subsection (3) of § 2-207. 2 R.A. Anderson, Uniform Commercial Code § 2-207:14, at 568; § 2-207:28, at 574-575; § 2-207:47, at 584; § 2-207:146, at 640 (3d ed. rev. 1997) (Anderson). Official comment 7, which Bayer overlooks, expressly directs as much. See 1 U.L.A. § 2-207 official comment 7, at 378 (Master ed. 1989) ("In many cases, as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made. In such cases, where the writings of the parties do not establish a contract, it is not necessary to determine which act or document constituted the offer and which the acceptance. . . . The only question is what terms are included in the contract, and subsection [3] furnishes the governing rule"). Under subsection (3) of § 2-207, "the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter." G. L. c. 106, § 2-207 (3). In this respect, one commentator has aptly referred to subsection (3) of § 2-207 as the "fall-back" rule. See 1 T.M. Quinn, Uniform Commercial Code Commentary and Law Digest par. 2-207[A][14], at 2-134 (2d ed. 1991). Under this rule, the Code accepts "common terms but rejects all the rest." *Id.* at 2-135. While this approach "serves to leave many matters uncovered,"

terms may be filled by "recourse to usages of trade or course of dealing under [§] 1-205 or, perhaps, the gap filling provisions of [§§] 2-300s." *Id.* See also Anderson, *supra* at § 2-207:78, at 602 (" 'supplementary terms' authorized by UCC § 2-207[3" include those that may be established by a course of dealing, course of performance, and usage of the trade").

Contrary to Bayer's contentions, subsection (2) of § 2-207 is not applicable for several reasons. First, subsection (2) instructs on how to ascertain the terms of a contract when the contract is formed either by the parties' writings or by a party's written confirmation of an oral contract, situations not present here (the parties' contract was formed by their conduct). See 1 U.L.A. § 2-207 official comments 1 and 2, *supra* at 377. See also Anderson, *supra* at § 2-207:28, at 574-575; § 2-207:30, at 576; § 2-207:160, at 647. Second, the rules set forth in subsection (2), concerning how the terms of a contract between merchants are determined, apply only when the acceptance or written confirmation contains "additional or different terms," a situation also not present here (Bayer's invoice is silent concerning how to resolve disputes). See 1 U.L.A. § 2-207 official comment 3, *supra* at 377. See also Anderson, *supra* at § 2-207:160, at 647-648. In addition, official comment 6, read in its entirety,[9] does not support Bayer's argument because the comment expressly applies to a situation where there are "conflicting" terms. *Id.* There are no provisions in Bayer's invoices that "conflict" with Malden Mills's arbitration provision because the invoices do not contain any provision stating how the parties intend to resolve their disputes. See White & Summers, *supra* at § 1-3, at 15 (official comment 6 not applicable when

---

[9]Official comment 6 to § 2-207, 1 U.L.A. 378 (Master ed. 1989), provides:

"6. If no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to. Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract. The contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this Act, including subsection (2). The written confirmation is also subject to Section 2-201. Under that section a failure to respond permits enforcement of a prior oral agreement; under this section a failure to respond permits additional terms to become part of the agreement."

term appears in first form, but not in second; there are no terms that "conflict").

Bayer argues that this case is governed by the language in *JOM, supra* at 54, stating that "[t]he terms of [the parties' contract formed by the parties' conduct] would then be determined under the 'default' test in § 2-207(3), *which implicitly incorporates the criteria prescribed in § 2-207(2)*" (emphasis supplied). We disagree. As discussed above, the criteria in subsection (2) determine what "additional or different terms" will or will not be part of a contract that is formed by the exchange of writings. Where the writings do not form a contract, subsection (3) states its own criteria — "those terms on which the writings agree" plus any terms that would be provided by other Code sections. One cannot turn to subsection (2) as another Code section that would supply a term when, by its express provisions, subsection (2) simply does not apply to the transaction.

Thus, the judge correctly concluded, under subsection (3) of § 2-207, that the arbitration provision in Malden Mills's purchase orders did not become a term of the parties' contract. The arbitration provision was not common to both Malden Mills's purchase orders and Bayer's invoices. Bayer properly does not argue that any of the gap-filling provisions of G. L. c. 106, apply. Because Bayer concedes that it never previously arbitrated a dispute with Malden Mills, we reject Bayer's claim that the parties' course of dealing requires us to enforce the arbitration provision.

Bayer also cites *Pervel Indus., Inc.* v. *T M Wallcovering, Inc.*, 871 F.2d 7 (2d Cir. 1989), in arguing that industry custom and usage favors enforcing Malden Mills's arbitration provision. That case, however, is not helpful to Bayer. The court upheld the existence of an enforceable arbitration agreement because the manufacturer had "a well established custom of sending purchase order confirmations containing an arbitration clause," and the buyer, who had "made numerous purchases over a period of time," received "in each instance a standard confirmation form which it either signed and returned or retained without objection." *Id.* at 8. Although Bayer never objected to the arbitration provision in Malden Mills's purchase orders, as we have previously explained, no agreement to arbitrate ever arose due, in part, to the expressly conditional language appearing in paragraph fourteen of Bayer's invoices, and to the lack of an

arbitration provision in its invoices. It is significant also that Bayer did not provide the judge with any evidence of industry custom and usage. We decline to conclude that industry custom and usage favors enforcing Malden Mills's arbitration provision.

The strong presumption of arbitrability, and the Federal and State policies favoring arbitration, see *Bureau of Special Investigations* v. *Coalition of Pub. Safety*, 430 Mass. 601, 603 (2000); *Carpenter* v. *Pomerantz*, 36 Mass. App. Ct. 627, 630 (1994); *Loche* v. *Dean Witter Reynolds, Inc.*, 26 Mass. App. Ct. 296, 300 (1988), cannot reasonably be applied here. No adequate satisfaction exists of the Federal Arbitration Act's[10] requirements of the existence of a "written [arbitration] provision in . . . a contract," or "an agreement [to arbitrate] in writing," 9 U.S.C. § 2 (1994), nor of the Massachusetts Uniform Arbitration Act's similar requirements of a "written [arbitration] agreement" or "a[n] [arbitration] provision in a written contract," G. L. c. 251, § 1. The parties' forms never established a written contract; Malden Mills's arbitration provision did not integrate into the contract by reason of the parties' conduct; and they did not otherwise agree to arbitrate. See *Quirk* v. *Data Terminal Sys., Inc.*, 379 Mass. 762, 768 (1980).

2. The judge correctly rejected Bayer's argument that the plaintiffs should be equitably estopped from refusing arbitration. Bayer has not shown that the plaintiffs intended to be bound to the arbitration provision in the absence of a final written contract with Bayer. Cf. *Hughes Masonry Co.* v. *Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 839 (7th Cir. 1981) (finding it inequitable "to permit [the plaintiff] to both claim that [the defendant] is liable to [it] for its failure to perform the contractual duties described in the . . . agreement and at the same time deny that [the defendant] is a party to that agreement in order to avoid arbitration of claims clearly within the ambit of the arbitration clause"). Bayer has not established any inequity in having to proceed to trial rather than to arbitration.[11]

---

[10]The plaintiffs do not dispute Bayer's contention that the Federal Arbitration Act is invoked because the transactions involved interstate commerce. See 9 U.S.C. § 2 (declaring enforceable "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction").

[11]While arbitration would normally be viewed as a more efficient method of dispute resolution, it has not been shown to be so here in view of the number of defendants and claims involved in the Superior Court.

See *Cleaveland* v. *Malden Sav. Bank,* 291 Mass. 295, 297 (1935).

3. Bayer may be right that the drafters of the Massachusetts version of the Code did not intend that § 2-207 should provide "an avenue for a party to strike the terms of its own purchase documents." Bayer, however, cannot ignore the fact that the use of its own boilerplate invoices contributed to the result that Bayer now finds problematic. The order denying the motion to compel arbitration and to stay litigation is affirmed.

*So ordered.*