**SIBCOIMTREX, INC., Plaintiff**

v.

**AMERICAN FOODS GROUP, INC., Defendant**

**No. CIV.A. 02–11713–GAO.**

United States District Court,
D. Massachusetts.

Jan. 27, 2003.

James L. Ackerman, Wadland & Ackerman, Andover, MA, for Sibcoimtrex Inc., Plaintiff.

Paul Saltzman, Tucker & Cinquegrana, Boston, Gary Hansen, Kari L. Wraspir, Oppenheimer Wolff & Donnelly, LLP, Minneapolis, MN, for American Foods Group, Inc, Defendant.

### MEMORANDUM AND ORDER

O'TOOLE, District Judge.

SibcoImtrex, Inc. ("SibcoImtrex") brought this breach of contract suit after the goods that American Foods Group, Inc. ("American Foods") sold to SibcoImtrex arrived several weeks late and were unsatisfactory. The goods in questions were about 50 tons of beef udders which SibcoImtrex intended to resell for use in pet food.

American Foods now moves to stay this case and to compel arbitration of the claims in the complaint. SibcoImtrex opposes the motion arguing that the arbitration clause that American Foods seeks to enforce never became part of the parties' contract. For the reasons discussed below, the Court determines that under Section 2–207(2)(b) of the Uniform Commercial Code, the arbitration clause is an added term that would materially alter the parties' agreement, and therefore it did not become part of their contract.

A. *Summary of Facts*

SibcoImtrex is a Massachusetts corporation based in Cambridge. American Foods is a food processing business headquartered in Green Bay, Wisconsin. In 2001, SibcoImtrex and American Foods discussed a possible long-term arrangement under which American Foods would supply SibcoImtrex with beef udders which SibcoImtrex would resell to a Russian customer for use in pet food. SibcoImtrex's president, Sergei Bogomolov, states that beginning in May 2001, he had numerous telephone conversations with the Director of International Sales of American Foods, Kenyon Jenkins, about this potential arrangement. During one of these conversations, on May 7, 2001, Bogomolov placed an order for a first shipment of beef to be delivered to SibcoImtrex's customer in Russia. On the same day, Jenkins sent Bogomolov a fax entitled "Confirmation," which stated that American Foods would sell SibcoImtrex 104,000 pounds of inedible beef udders for $18,720. *Bogomolov Aff.* Ex. 1.

On July 20, 2001, American Foods sent SibcoImtrex two invoices, each for 52,020 pounds of beef udders. The following statement appears on the front of the invoices: "The terms and conditions of sale appearing on the reverse side hereof, including arbitration provision, are part of this sale." *Obermiller Aff.* Ex. B. The reverse side of the invoices states, in part, that:

> All other matters of construction, performance or breach of this contract shall be governed by the Uniform Commercial Code. Any controversy of claim arising out of or relating to this contract or the breach thereof shall be settled by arbitration in Minneapolis, Minnesota, in accordance with the rules of the American Arbitration Association, and judg-

ment upon the award may be entered in any court having jurisdiction thereof. *Id.* The text also states that "Except as hereafter modified, these terms and conditions apply to this and all subsequent sales by seller to buyer." *Id.* The shipment eventually arrived in Russia and was accepted by SibcoImtrex's customer.

After the first order was placed, Jenkins and Bogomolov continued their conversations. Bogomolov claims that he and Jenkins agreed that for a term of three years, SibcoImtrex would place all its orders for beef udders from SibcoImtrex's Russian customer with American Foods and American Foods would supply 100% of what SibcoImtrex needed. *Bogomolov Aff.* ¶ 11.

The next round of orders by SibcoImtrex followed a slightly different pattern from the first. According to Bogomolov, he contacted Jenkins on July 3 "and placed an order for about 440,000 lbs. [of beef udders], 100,000 lbs. of which were to be shipped in the next month or two." *Bogomolov Aff.* ¶ 12. A fax from Jenkins to Bogomolov dated July 3, 2002, confirms that the two agreed that 440,924 pounds of inedible beef udders would be sold and shipped to SibcoImtrex sometime in July and August 2001 for $0.20 per pound. *Id.* Ex. 2. In early August, SibcoImtrex placed two orders for 51,090 pounds of beef udders with American Foods for $0.20 per pound. *Obermiller Aff.* Ex. C. These orders were followed up by two invoices from American Foods to SibcoImtrex which included the same arbitration provisions as the July invoices. *Id.* Ex. D.

Problems arose with the August order. For reasons that are disputed by the parties, the shipment was delayed and, according to the complaint, the shipment reached St. Petersburg, Russia, seven weeks late. The complaint also alleges that American Foods was supposed to "provide veterinary certificates with vari-

ous items of information, including shipping container numbers ... [but] failed to include shipping container numbers, as a result of which there was a delay in the release of the goods" in St. Petersburg. *Complaint* ¶¶ 8–9. Once the beef udders reached the Russian customer, SibcoImtrex claims they were "unmerchantable, unfit for the purpose intended and unable to pass in the trade under the contract description." *Complaint* ¶ 10.

On July 1, 2002, SibcoImtrex filed suit for breach of contract against American Foods in the Massachusetts Superior Court. Relying on diversity of citizenship jurisdiction, American Foods removed the matter to this Court on August 26, 2002.

## B. *UCC Section 2–207(2) Governs Parties' Dispute*

Whether SibcoImtrex can be compelled to arbitrate its dispute with American Foods turns on whether the arbitration clause printed on American Foods' standard invoice form is a part of the contract between the parties. Disputes about whether a specific term was included in a contract for the sale of goods after an exchange of forms are resolved by the rules set out in Section 2–207 of the UCC. *See JOM, Inc. v. Adell Plastics, Inc.,* 193 F.3d 47, 52–54 (1st Cir.1999). All three of the possible sources of applicable state law—Minnesota, Wisconsin, Massachusetts—have adopted this provision of the UCC,[1] which states:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly

made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

Applying this framework to the facts of this case, the invoices are a "seasonable expression of acceptance," and the arbitration clause is an "additional term" which becomes part of the parties' contract unless its inclusion would "materially alter[ ]" the deal they previously agreed upon.

█ Both parties attempt to evade application of Section 2–207(2)'s material alteration test to the arbitration clause. First, SibcoImtrex asserts that the arbitration clause is not a part of its contract under the terms of Section 2–207(3). SibcoImtrex attempts to compare its situation with that of the parties in *Commerce & Indus. Ins. Co. v. Bayer Corp.,* 433 Mass. 388, 742 N.E.2d 567, 572–73 (2001), where

---

**1.** The Massachusetts version of Section 2–207 does make one deviation from the text of the UCC. *See Commerce & Ind. Ins. Co. v. Bayer*

*Co.,* 433 Mass. 388, 742 N.E.2d 567, 570 n. 5 (2001) (noting difference in language). However, that deviation is not relevant here.

the Massachusetts Supreme Judicial Court held that, under Section 2–207(3), the parties were not bound by any terms to which they did not agree. However, in *Commerce & Industry*, the Supreme Judicial Court held that a contract "never came into being" between the buyer and seller because each specifically had required assent by the other to its additional written terms before a contract could be formed. *Id.* at 572. In the case of SibcoImtrex and American Foods, no such requirement was insisted on by either party. Instead, American Foods simply sent SibcoImtrex invoices that included additional terms; it did not ask SibcoImtrex to expressly accept or reject those terms. In such circumstances, Section 2–207(3) itself requires that the question whether the added terms became part of the contract is answered under the conditions set by Section 2–207(2). *See also* 1 White & Summers, *Uniform Commercial Code*, § 1–3, at 25–27 (4th ed.1995) (if the parties reach an informal agreement on terms, but one of the parties later sends additional terms, Section 2–207(2) governs).

█ Next, SibcoImtrex argues that the fax sent by Jenkins to Bogomolov on July 3 was an integrated contract which governed the August shipment, and the invoices could not supply any new terms to that agreement. This argument fails because the faxed confirmation left too many matters unsettled to be viewed as a final, complete contract. For example, it did not state specific delivery dates, payment dates, or shipment terms. Further, the price term set forth in the fax—$0.20 per pound of beef—was changed to $0.19 per pound of beef in the invoice. The faxed confirmation was not a final, unalterable agreement between the parties.

For its part, American Foods tries to move the arbitration clause out of the domain of Section 2–207(2) by arguing that the terms in the first invoices SibcoImtrex received from American Foods in July automatically became part of all future contracts between the parties. American Foods points out that the July invoices stated that their terms would "apply to this and all subsequent sales by seller to buyer." However, the principal case that American Foods cites as support for this argument, *Avedon Eng'g, Inc. v. Seatex*, 112 F.Supp.2d 1090 (D.Colo.2000), did not hold that the terms in the earlier invoices were necessarily a part of all subsequent contracts between the parties. Instead, the court looked at the parties' course of dealings to determine whether the arbitration clause in the invoices represented a material alteration of their contract. *Id.* at 1093–94. American Foods might be understood to be arguing for a kind of estoppel—that SibcoImtrex was bound to object when it received the first invoices or forever hold its peace—but there is no authority for such a proposition. The only proper inquiry, guided by Section 2–207, is to determine whether the parties agreed, explicitly or implicitly, to the additional term.

## C. The Arbitration Clause Would Be a Material Alteration

Courts evaluating whether a proposed additional term amounts to a material alteration of the parties' agreement often inquire whether the term would "result in surprise or hardship" to the non-proposing party, a standard derived from Comment 4 to Section 2–207. *See e.g., Bayway Ref. Co. v. Oxygenated Mktg. And Trading A.G.*, 215 F.3d 219, 224 (2d Cir.2000); *American Ins. Co. v. El Paso Pipe and Supply Co.*, 978 F.2d 1185, 1190 (10th Cir. 1992); *Comark Merch., Inc. v. Highland Group, Inc.*, 932 F.2d 1196, 1201 (7th Cir. 1991).

There are drawbacks to that approach. To begin with, it tends to take a snippet of the language of Comment 4 out of context, emphasizing it disproportionately. For instance, in the rest of Comment 4 and in Comment 5, examples are suggested to help define by illustration what would and would not be considered a "material alteration." The "surprise or hardship" test is but one of a number of factors that could be considered. Second, using "surprise or hardship" as the exclusive test of materiality is inconsistent with the syntax of Comment 4. The comment gives "[e]xamples of typical clauses which would normally 'materially alter' the contract *and so result in surprise or hardship* if incorporated without express awareness by the other party." (emphasis added). In other words, surprise and hardship are a consequence of material alteration, not a definition of it. Some courts seem to read the phrase in reverse, as if the examples were of clauses that result in surprise or hardship *and so* would represent a material alteration.

This is not just linguistic quibbling. Hardship is not a necessary sign that the parties' deal has been materially altered by an added provision. For example, their deal may have been concluded against a background of a course of dealing or a tradition of custom or practice in the industry that assumed the incorporation of the added clause. Comment 5 includes some examples of clauses that fall "within the range of trade practice" or "customary trade tolerances" and thus would not ordinarily be considered material alterations if added by one party's form. If the term is properly considered as part of the deal—an immaterial addition, as it were—it does not matter whether its enforcement would impose a "hardship" to the party against whom it is enforced, any more than it would matter that a negotiated and expressly agreed upon term might work a hardship when enforced. *See Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1336 (7th Cir.1991) (observing that "[y]ou cannot walk away from a contract that you can fairly be deemed to have agreed to, merely because performance turns out to be a hardship for you, unless you can squeeze yourself into the impossibility defense or some related doctrine of excuse").

Surprise is some measure of the materiality of an alteration, because provisions that are expressed or assumed as part of the deal will not be surprising, while significant new terms will be. But while a surprising addition is easily seen as an alteration of the pre-existing deal, the fact that the addition is a surprise does not always mean that it is material. An added term might be surprising—because it is new—but immaterial—because it is relatively trivial.

■ There is no reason, based either on the text of Section 2–207 itself or on the comments that follow it, to think that the drafters meant to define a unique subspecies of materiality. Like reasonableness, materiality is a familiar concept in the law, including commercial law,[2] and it is a capacious concept. Ultimately, whether a term is material should be judged in the specific context of all relevant facts and circumstances.

Thus, what is appropriate is a fact specific, case-by-case analysis to determine whether a proposed term should become a part of the parties' contract. *See also American Ins. Co.*, 978 F.2d at 1190 ("The majority of courts reviewing whether an

---

2. *See Black's Law Dictionary* 991 (7th ed.1999)(defining "material" as "[o]f such a nature that knowledge of the item would af- fect a person's decision-making process; significant; essential <material alteration of the document>'").

addition to a contract constitutes a material alteration hold that it depends on the unique facts of every case."). Of course, among the factors to be weighed in considering all the relevant facts and circumstances will be whether the inclusion of the added term in the parties' contract would result in unfair surprise or hardship.

■ In this case, there is no indication that the parties ever expressly addressed the question of how disputes would be resolved, except by American Foods' unilateral insertion of the arbitration clause in its form invoice. The fact that the invoices for the first, uncontroversial shipment also included the term is not enough to establish a consistent course of dealing between the parties sufficient to substitute for express agreement or otherwise to signify mutual assent, albeit tacit, to the arbitration provision. The cases cited by American Foods in support of its course-of-dealing argument all involved more extended relationships and/or the regular inclusion of the arbitration clause in one side's documents. One swallow does not make a Spring, and the single prior transaction does not establish a course of dealing between these parties from which SibcoImtrex's assent (or lack of objection) to the arbitration provision can be inferred. *See Diskin v. J.P. Stevens & Co.,* 836 F.2d 47, 51 (1st Cir.1987) (observing that the "mere *use* of the same ineffective form of contract is not the functional equivalent of evidence which affirmatively establishes a party's prior consent to arbitrate. Thus, we will not imply appellant's consent to arbitrate based only on appellee's vague assertion of prior dealings.").

An agreement to arbitrate is an agreement to forego other available avenues of seeking relief for breach of the contract, most notably including adjudication in a civil action where trial by jury is an option.

In narrowing the range of choice, the clause operates, in general, as a limitation of remedies. Comment 4 to Section 2–207 implies that added terms that limit otherwise available remedies—or avenues to remedies—are to be considered material additions that only become effective on an express acceptance. The comment includes clauses negating otherwise applicable warranties (a substantive limitation) or requiring complaints to be made in a time materially shorter than otherwise set (a procedural limitation) as examples of material alterations within the meaning of Section 2–207.

Similarly, courts have considered forum selection clauses to be material. *See Prod. Components, Inc. v. Regency Door and Hardware, Inc.,* 568 F.Supp. 651, 654 (S.D.Ind.1983) (stating that a forum selection clause is material when it would require a party to resolve its dispute "in a forum where it could not otherwise be compelled to appear") (citing *Gen. Instrument Corp. v. Tie Mfg., Inc.,* 517 F.Supp. 1231, 1235 (S.D.N.Y.1981)). *Accord M.K.C. Equip. Co. v. M.A.I.L. Code, Inc.,* 843 F.Supp. 679, 686 (D.Kan.1994); *Dale R. Horning Co. v. Falconer Glass Indus., Inc.,* 710 F.Supp. 693, 698–99 (S.D.Ind. 1989). The arbitration clause in this case requires arbitration in Minnesota. Whether SibcoImtrex could be compelled to defend a claim in the state courts of Minnesota under that State's long-arm jurisdiction is a question that need not be resolved; it is enough to recognize that a clause surrendering in advance any potential objection to personal jurisdiction in Minnesota is not a trivial or incidental concession.

■ It is true that national policy, expressed in the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.,* favors arbitration of commercial disputes where the parties have agreed to do so. *See Southland*

*Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). However, the existence of an agreement, and hence an obligation, to arbitrate "is totally dependent on the private will of the parties as embodied in whatever contract they may have entered into." *MCI Telecomms. Corp. v. Exalon Indus., Inc.,* 138 F.3d 426, 428 (1st Cir.1998). Proof of the existence of an agreement to arbitrate must always precede an order enforcing the agreement. The federal courts' receptivity to enforcing arbitration clauses does not either require or justify any lessening of the proof needed to establish the parties' assent to the clause in the first place.

### D. *Conclusion*

In summary, the proposed arbitration clause did not become a part of the parties' contract because it "materially altered" the contract formed by the parties. Accordingly, the motion to stay and to compel arbitration (docket nos. 6–1, 6–2) therefore is DENIED.

It is SO ORDERED.