## BORDEN CHEMICAL, INC. *vs.* JAHN FOUNDRY CORPORATION.

No. 04-P-138.

Hampden. April 6, 2005. - September 29, 2005.

Present: GREENBERG, SMITH, & GELINAS, JJ.

*Indemnity. Uniform Commercial Code,* Indemnity. *Contract,* Indemnity.

The judge in a civil action properly granted summary judgment in favor of the third-party defendant (buyer) on the claim that it was contractually bound to indemnify the third-party plaintiff (seller), pursuant to a provision in the seller's invoices, for liabilities and costs incurred by the seller in connection with the buyer's use of the seller's product, where the indemnity provision in the invoices constituted a material alteration to the buyer's purchase orders as a matter of law and, thus, did not become part of the parties' sales contract. [641-647]

CIVIL ACTION commenced in the Superior Court Department on November 30, 1999.

The case was heard by *David A. McLaughlin,* J., on motions for summary judgment, and entry of separate and final judgment was ordered by him.

*Prentice H. Marshall, Jr.,* of Illinois (*Charles K. Bergin, Jr.,* with him) for the plaintiff.

*John J. McCarthy* for the defendant.

SMITH, J. Borden Chemical, Inc. (Borden), the third-party plaintiff in a personal injury action, appeals from a summary judgment entered in favor of Jahn Foundry Corporation (Jahn), the third-party defendant, on Borden's claim that Jahn was contractually bound to indemnify Borden, pursuant to a provision in Borden's invoices, for liabilities and costs incurred by Borden in connection with Jahn's use of Borden's product, a resin known as Durite. The judge ruled that, in accordance with the Massachusetts Uniform Commercial Code, G. L. c. 106, § 2-207, the indemnity provision in Borden's invoices did not become part of the sales contract between the parties. We affirm.

1. *Background.* We take the undisputed facts from the judge's summary judgment memoranda in this and related proceedings, supplemented from the summary judgment record. This matter has its origins in a tragic explosion that took place at Jahn's foundry on February 25, 1999, which resulted in the deaths of three foundry employees and injuries to nine others. Litigation arising from the accident included claims for personal injuries and wrongful death against Borden, the injured parties claiming that the resin supplied by Borden to Jahn caused the explosion.[1] Borden brought a third-party suit against Jahn for indemnification, based on an indemnity provision printed on the back of Borden's invoices that it sent to Jahn for the resin shipments.

At all relevant times, Jahn was in the business of producing castings, a product that was made by pouring molten metal into a shell mold. The shell molds, in turn, were made from a mixture of sand and resin. Up until 1994 or 1995, Jahn purchased resins from various manufacturers, including Borden. By 1996, Jahn was purchasing resin solely from Borden.

Prior to 1998, Jahn sent purchase orders for resin to Borden annually; those purchase orders contained no terms bearing on warranties or indemnification. Jahn would then call Borden for individual shipments, as needed. Borden shipped the resin as requested, and would send Jahn an invoice that contained, among other preprinted terms, an indemnity provision. Jahn's purchasing manager, Robert Cote, typically initialed the Borden invoices next to the amount owed and gave them to his accounts payable staff to pay.

The following indemnity provision appeared in all Borden invoices sent to Jahn over the years, despite changes to the invoice's format in 1998:

> "4. INDEMNITY AGREEMENT. Buyer shall defend, indemnify, and hold Seller harmless from and against all claims, liabilities, costs and expenses (including, but not limited to, those related to injury or to death of Buyer's employees) arising from or connected with the possession, handling, processing or use of the product by Buyer or others . . . ."

[1]Borden informs us that it has settled all claims against it in connection with the explosion.

The Borden invoices also included the following provision:

"18. EXISTING CONTRACT AND MODIFICATION . . . . No modification of this contract shall be of any force or effect unless in writing and signed by the party claimed to be bound thereby, and no modification shall be effected by the acknowledgment or acceptance of purchase order forms containing different conditions."

In 1998, the form of Jahn's annual purchase order to Borden changed as well. Those changes added certain preprinted terms and conditions to the purchase order, including the following:

"1. WARRANTY. Seller expressly warrants that the goods covered by this order are of merchantable quality, free from defects in material or workmanship, confirming [*sic*] to the specifications and drawings, if any, approved in writing or furnished by Buyer and suitable for purposes intended by Buyer and Buyer may assume Seller knows the use intended unless Seller notifies Buyer in writing to the contrary prior to commencement of work and shipment, all without limitation or exclusion of any other warranty, expressed or implied.

" . . .

"5. CONFORMING GOODS. Acceptance of all or any part of the goods shall not be deemed to be a waiver of Buyer's right either to cancel or to return all or any portion of the goods because of failure to confirm [*sic*] to order, or by reason of defects, latest [*sic*] or patent, or other breach of warranty, or to make any claim for damages, including manufacturing costs and loss of profits or other special damages occasioned [by] the Buyer. Such right shall be in addition to any other remedies provided by law."

These new provisions were included in the blanket purchase orders sent from Jahn to Borden in 1998 and 1999. Borden continued to send resin shipments as requested, as well as an invoice containing the same indemnity agreement and limitations on warranty as in all of its earlier invoices.

The explosion at Jahn's facility took place in early 1999.

Investigation of the explosion revealed that resin supplied in 1998 or 1999 was the likely cause. The victims of the explosion and their families and estates commenced this action against Borden and other defendants, alleging that the Durite manufactured by Borden and supplied to Jahn was involved in the explosion. Based on the indemnity agreement provision in its invoices, Borden brought a third-party complaint against Jahn for reimbursement of any damages for which Borden was held liable, and for the costs of defense.

On cross motions for summary judgment, the judge ruled that, pursuant to G. L. c. 106, § 2-207, the indemnity agreement provision in Borden's invoices represented a material alteration to the terms set out in Jahn's 1998 and 1999 purchase orders, and so did not become a part of the parties' contract. Borden filed this appeal.

2. *The "battle of the forms."* At the center of this appeal is the competing language in the documents exchanged between the parties, addressing liabilities, warranties, and waivers in connection with Borden's sale of resin to Jahn. Borden claims that the indemnity agreement in its invoices went unchallenged by Jahn over the course of the parties' commercial relationship, and so became an accepted and binding term in the resin sales transactions. Jahn counters, correctly in our view, that the changes in its 1998 purchase order, inserting express warranty terms, undercut the parties' prior course of dealing and rendered the invoices' indemnity agreement a material alteration to Jahn's purchase order and, accordingly, unenforceable.

It is not uncommon for merchants involved in the purchase and sale of goods to send each other preprinted forms at various stages in the transaction. Once a problem arises with the sale, disputes may ensue as to which form is binding, particularly when the parties have exchanged paperwork containing self-serving and incongruous terms. See *Commerce & Indus. Ins. Co.* v. *Bayer Corp.*, 433 Mass. 388, 391 (2001) (describing "battle of the forms" sale as one "in which a buyer and a seller each attempt to consummate a commercial transaction through the exchange of self-serving preprinted forms that clash, and contradict each other, on both material and minor terms"). See also *Ionics, Inc.* v. *Elmwood Sensors, Inc.*, 110 F.3d 184, 189

(1st Cir. 1997) ("The reality of modern commercial dealings, as this case demonstrates, is that not all participants read their forms"). In the case of sales transactions governed by the Massachusetts Uniform Commercial Code (U.C.C.), such a dispute may be resolved by reference to G. L. c. 106, § 2-207. *Commerce & Indus. Ins. Co.* v. *Bayer Corp.*, 443 Mass. at 392 ("Section 2-207 was enacted with the expectation of creating an orderly mechanism to resolve commercial disputes resulting from a 'battle of the forms' "). See *JOM, Inc.* v. *Adell Plastics, Inc.*, 193 F.3d 47, 52-54 (1st Cir. 1999); *SibcoImtrex, Inc.* v. *American Foods Group, Inc.*, 241 F. Supp. 2d 104, 107 (D. Mass. 2003).[2],[3]

General Laws c. 106, § 2-207, inserted by St. 1957, c. 765, § 1, and amended by St. 1991, c. 319, titled "Additional Terms in Acceptance or Confirmation," provides:

> "(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> "(2) The additional or different terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

> "(*a*) the offer expressly limits acceptance to the terms of the offer;

> "(*b*) they materially alter it; or

> "(*c*) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

---

[2]Massachusetts has adopted the relevant provision from the Uniform Commercial Code. The Massachusetts version deviates from the Uniform Commercial Code in subsection (2), by including, after "additional," the phrase "or different." See *Commerce & Indus. Ins. Co.* v. *Bayer Corp.*, 433 Mass. at 391 n.5.

[3]Borden's invoices provided that Ohio law would govern disputes. Borden does not press that provision on appeal.

> "(3) Conduct by both parties which recognizes the exist-
> ence of a contract is sufficient to establish a contract for
> sale although the writings of the parties do not otherwise
> establish a contract. In such case the terms of the particular
> contract consist of those terms on which the writings of
> the parties agree, together with any supplementary terms
> incorporated under any other provisions of this chapter."

Here, the judge appropriately applied the mechanism for resolv-
ing disputes set out in c. 106, § 2-207(1) through (3), to the
undisputed facts in the summary judgment record, in order to
determine what language from the parties' preprinted forms
should constitute the actual terms of the parties' agreement.

Starting with § 2-207(1), the judge observed that, while the
essential components of the sale were agreed to, that is, product,
price, and quantity, Borden's invoices did not bind Jahn to the
indemnity agreement because they did not make explicit that
Jahn's acceptance was conditional on Jahn's consent to the
invoices' additional terms. Put another way, § 2-207(1), as
explained in *JOM, Inc.* v. *Adell Plastics, Inc.*, 193 F.3d at 53,
operates as follows: "First, if the parties exchange forms with
divergent terms, yet the seller's invoice does not state that its
acceptance is made 'expressly conditional' on the buyer's assent
to any additional or different terms in the invoice, a contract is
formed, and its precise terms are determined through recourse
to the three-part test in § 2-207(2)."

We turn, then, to that three-part test in § 2-207(2), to
determine whether the indemnity agreement should become part
of the parties' contract. There is no dispute that the first part of
the test, § 2-207(2)(*a*), is not applicable to these facts: Jahn's
purchase order did not expressly limit Borden's acceptance to
the terms of the purchase order.

The next subsection, § 2-207(2)(*b*), however, is directly on
point. This provision "makes additional terms which are
included in a written confirmation part of the parties' contract
unless 'they materially alter it.' " *Tupman Thurlow Co.* v. *Woolf
Intl. Corp.*, 43 Mass. App. Ct. 334, 338 (1997). Jahn's 1998 and
1999 purchase orders provided that Borden warranted that the
resin was merchantable, and that acceptance of the resin was
not a waiver of that warranty or of Jahn's rights and remedies

for losses stemming from the product. Borden's invoices, by contrast, contained the indemnity agreement, shifting all risk of loss to Jahn, and provided that Borden's acceptance of Jahn's purchase order containing contrary provisions was not a waiver of the indemnification. The judge, faced with these inharmonious forms, properly determined that the indemnity agreement in Borden's invoices materially altered the warranties set out in Jahn's 1998 and 1999 purchase orders.

Under subsection § 2-207(2)(*b*), additional terms in an acceptance or confirmation, here Borden's invoices, that materially alter the original offer, in this case Jahn's 1998 and 1999 purchase orders, are not deemed assented to upon acceptance of the goods, and do not become part of the parties' sales agreement. Comment 4 to § 2-207(2)(*b*) explains what is meant by a material alteration, and includes the following example: "a clause negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches."[4] Even more compelling than that example, we think, is the indemnity agreement involved in this case, which goes well beyond simply negating such warranties. "Clearly, a shift in legal liability which has the effect of relieving one party of the potential for economic hardship and placing this burden upon another party is an important term in any contract." *Winter Panel Corp.* v. *Reichhold Chems., Inc.,* 823 F. Supp. 963, 972 (D. Mass. 1993), quoting from *Trans-Aire Intl., Inc.* v. *Northern Adhesive Co.,* 882 F.2d 1254, 1263 (7th Cir. 1989) (indemnification agreement in small print on the back of a preprinted form was a material alteration under U.C.C. § 2-207(2)(*b*), as it "relieves a party of otherwise well-established legal duties and obligations"). So too, here; not only would inclusion of the indemnity agreement in the parties' contract run counter to Jahn's express warranties in its 1998 and 1999 purchase orders, but it would also have the significant effect of shifting substantial economic risk for liability for Borden's product from Borden, the manufacturer, to the buyer. See

---

[4]"U.C.C. Official Comments 'do not have the force of law, but are nonetheless the most useful of several aids to interpretation and construction of the [U.C.C.].' " *JOM, Inc.* v. *Adell Plastics, Inc.,* 193 F.3d at 57 n.6 , quoting from *LTV Energy Prods. Co.* v. *Northern States Contracting Co.,* 162 B.R. 949, 955 n.5 (Bankr. S.D.N.Y. 1994).

*Winter Panel Corp.* v. *Reichhold Chems., Inc.*, 823 F. Supp. at 972.

Based on the foregoing, we conclude from the undisputed facts that the indemnity agreement in Borden's invoices was such a significant departure from the protections set out in Jahn's 1998 and 1999 purchase orders as to constitute a material alteration as matter of law. Accordingly, under § 2-207, the indemnity agreement did not become part of the parties' sales contract.

Borden's principal argument on appeal is that Jahn accepted the invoices' terms, including the indemnity agreement, either by the initialing of the invoices by Jahn's purchasing manager, Robert Cote, or by the parties' course of dealing. Viewing the evidence in Borden's favor, as the party opposing summary judgment, the undisputed facts still do not support the contention. See generally *Ng Bros. Constr., Inc.* v. *Cranney*, 436 Mass. 638, 643-644 (2002) (in summary judgment proceedings, the evidence presented is always construed in favor of the party opposing the motion, and that party is given the benefits of all reasonable inferences that can be drawn from the evidence).

Cote's deposition testimony was uncontroverted that it was his practice to initial the Borden invoices as a means of instructing Jahn's own accounts payable staff that the amount therein should be paid. Borden points to no evidence that the invoices bearing Cote's initials were sent back to Borden, nor does Borden refute Jahn's assertion that Borden obtained initialed copies of its invoices only in response to discovery requests in connection with this litigation. As a consequence, on this record, the fact that Cote initialed Borden's invoices solely for in-house use, with no communication to Borden, does not support a reasonable inference that Jahn expressly accepted the indemnity agreement contained therein. The cases relied upon by Borden do not hold otherwise. See, e.g., *Thomas* v. *Massachusetts Bay Transp. Authy.*, 39 Mass. App. Ct. 537, 542-544 (1995) (issue presented was whether an unconditional acceptance had been communicated to the other party so as to establish a binding settlement agreement).

Borden further contends that Jahn's acceptance of Borden's resin shipments without protesting the invoices' terms in the

years preceding the shipment involved in the explosion established Jahn's acceptance of the invoices' indemnity agreement or, at the very least, established that the indemnity agreement was not a material alteration to the purchase order's terms. See, e.g., *SibcoImtrex, Inc.* v. *American Foods Group, Inc.*, 241 F. Supp. 2d at 110 (recognizing that a consistent course of dealing between the parties may substitute for an express agreement or signify mutual consent to an additional term inserted in the seller's invoice). In arguing that the parties' course of dealing over a number of years established the invoices' terms as accepted, Borden does not satisfactorily address the addition of significant new terms and conditions to Jahn's purchase order as of 1998. For that reason, the cases upon which Borden relies, involving enforcement of terms in transactions after lengthy histories of prior dealing between the parties, do not aid its position. See, e.g., *Tupman Thurlow Co.* v. *Woolf Intl. Corp.*, 43 Mass. App. Ct. at 338-339 (purchaser failed to object to invoices' arbitration provision over a lengthy history of sixty-five transactions involving the same forms); *Waukesha Foundry, Inc.* v. *Industrial Engr., Inc.*, 91 F.3d 1002, 1009 (7th Cir. 1996) (sixty orders over four years without objection to disclaimer of warranty in invoices).

In this case, the summary judgment record established that, for the resin shipments involved in the claims arising from the 1999 explosion, Jahn's 1998 and 1999 purchase orders contained new terms respecting warranties and remedies in connection with Borden's product that were inconsistent with an agreement to indemnify Borden. Proof of prior dealings under Jahn's pre-1998 purchase orders, which were silent on the issue, would not support a reasonable inference that Jahn accepted the indemnity agreement once Jahn started including in its purchase orders express provisions to the contrary. See, e.g., *JOM, Inc.* v. *Adell Plastics, Inc.*, 193 F.3d at 57 ("The buyer which explicitly includes a particular term in its purchase order . . . presumably demonstrates that it has considered the allocation of business risks associated with the term, and, for example, has determined that it is unwilling to accept greater risk").

Our review of the undisputed facts in the record confirms

that the indemnity agreement in Borden's invoices effected a material alteration of Jahn's purchase orders, as matter of law, for the shipments alleged to be involved in the explosion at Jahn's facility. Accordingly, under § 2-207(2)(*b*), the language in Borden's invoices purporting to bind Jahn to an indemnity agreement did not become part of the parties' contract, and summary judgment was properly entered in Jahn's favor on the third-party complaint.

*Judgment affirmed.*