# United States Court of Appeals
## For the First Circuit

No. 03-1905

PRIDE HYUNDAI, INC., BLACKSTONE SUBARU, INC., d/b/a PRIDE
HYUNDAI OF SEEKONK, PRIDE DODGE, INC., and
PRIDE CHRYSLER-PLYMOUTH, INC.,

Plaintiffs, Appellants,

v.

CHRYSLER FINANCIAL COMPANY, L.L.C.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Boudin, Chief Judge,
Lynch, Circuit Judge, and
Howard, Circuit Judge.

Preston W. Halperin, with whom Christine L. DeRosa and
Shechtman Halperin Savage, LLP were on brief, for appellants.
Jonathan D. Deily, with whom Richard C. Maider and Deily,
Mooney & Glastetter, LLP were on brief, for appellee.

May 27, 2004

**LYNCH**, **Circuit Judge**.  In July 2001, Massachusetts, along with virtually every other state, revised Article Nine of its commercial code.  It appears that this is a case of first impression under Massachusetts law as to the revised § 9-204.

Of primary concern here are revisions that altered § 9-204, which deals with the enforceability of dragnet clauses in secured commercial lending agreements.  Dragnet clauses purport to secure all of a debtor's obligations to a creditor, regardless of whether those obligations arise prior to, concurrent with, or after the instrument containing the dragnet clause itself.  See generally Bruce A. Campbell, Contracts Jurisprudence and Article Nine of the Uniform Commercial Code: The Allowable Scope of Future Advance and All Obligations Clauses in Commercial Security Agreements, 37 Hastings L.J. 1007 (1986).  The Official Commentary to the amended § 9-204 explicitly disavowed prior case law that had interpreted dragnet clauses using special interpretive tests, such as whether the obligations created along with the dragnet clause were of the same or similar type or class as other obligations.

Our interpretation of the revised § 9-204 is informed by a second change to Article Nine that was also made by the 2001 amendments.  The amendments expanded the definition of good faith required in all contracts under Article Nine to include "the observance of reasonable commercial standards of fair dealing." Mass. Gen. Laws ch. 106, § 9-102(43).  It appears that this

expansion of the definition of good faith has also not yet been addressed by Massachusetts' highest court.

At stake is whether a commercial lender, Chrysler Financing Company (CFC), violated its contractual obligations or its duty under Mass. Gen. Laws ch. 93A not to engage in unfair and deceptive practices. These claims by the commonly-owned Pride car dealerships, plaintiffs, are primarily premised on CFC's unwillingness to release its first position security interest in Pride's assets. CFC insists that Pride deposit 1.5% of the value of certain outstanding contracts in a non-interest bearing account for the payment of contingent future debts that might arise in conjunction with those contracts. Pride argues that these contingent retail financing debts are not secured and thus that CFC has no right to insist on such a deposit before releasing the security interest. CFC, in turn, contends that these future debts are indeed secured by a dragnet clause in its 1995 and 1996 wholesale financing agreements with Pride, that its actions are reasonable, and thus that there is neither a chapter 93A violation nor a breach of contract.

The district court ruled for CFC on all claims and denied any relief to Pride. Unfortunately, neither party brought the 2001 amendments or Official Commentary to the district court's attention, instead relying on the now apparently disavowed case

law.  This court notified the parties of the issue and sought and received additional briefing on the effect of the amendments.

We now affirm.  We do so, not surprisingly, on grounds different from the district court.  The clear language of the dragnet clause in the wholesale finance agreements secures Pride's contingent retail finance debt to CFC and there is no evidence that application of the dragnet clause was not in good faith or would violate "reasonable commercial standards of fair dealing."  Mass Gen. Laws ch. 106, § 9-102(43).

## I.

The plaintiffs, Pride Hyundai, Blackstone Subaru, Pride Dodge, and Pride Chrysler-Plymouth (collectively "Pride") are four car dealerships that are owned by Alfredo Dos Anjos.  In early 1987 one of the Pride dealerships, Pride Chrysler-Plymouth, entered into a retail financing agreement with the defendant, CFC.

Retail financing agreements facilitate a dealership's financing of its customers' automobile purchases.  Customers who purchase cars from a dealership frequently do not pay all of the purchase price up front, but instead finance their purchases using an installment contract with the dealership.  These installment contracts allow the customer to pay for an automobile over the course of an extended period of time, lasting up to seven years.  Generally, though, dealerships do not have the resources to maintain numerous customer installment contracts for prolonged

-4-

periods of time, so they seek retail financing agreements with credit companies.

Retail financing agreements allow a dealership to sell, via assignment, numerous installment contracts to a large lender, here CFC, with relatively minimal transaction costs. They do so by setting forth in advance the terms by which the lender will purchase the installment contracts from the dealer. These terms include a formula for the price that the lender will pay for a given installment contract; the formula takes into account factors such as the amount financed in the installment contract and the length of the repayment term. Dealerships typically have retail financing agreements with multiple lenders, in part because these agreements only set the terms for future purchases and do not require the lender to purchase a minimum amount of installment contracts. The market for installment contracts is described in the industry as the retail paper market.

The retail financing agreement between Pride Chrysler-Plymouth and CFC also provided that if a customer paid off the installment contract before maturity or defaulted -- either one of which decreases the value of the contract to CFC -- then Pride Chrysler-Plymouth would be liable to CFC for a portion of the unrealized purchase price. The parties term these contingent liabilities "charge-backs": the dealership is charged back a portion of the unrealized profit stemming from the installment

contracts, thus splitting the risk inherent in the financing between both the lender and the dealership. Although the retail financing contract does not create an interest securing these contingent liabilities, it does provide that the dealership must maintain a minimum reserve balance in an account held by CFC for the purpose of paying these charge-backs. The balance of this charge-back account must be either $1,000 or 1.5% of the value of the installment contracts purchased, whichever is greater. The account is non-interest bearing; once CFC is paid from the charge-back account the final amount it is owed, the balance remaining in the account is returned to Pride Chrysler-Plymouth.

In late 1994, CFC attempted to expand its business relationship with the Pride dealerships beyond the retail financing it had been providing to Pride Chrysler-Plymouth. William Nicolo, a dealer relations manager for CFC, approached Dos Anjos and suggested that CFC enter into retail financing agreements with Dos Anjos's other Pride dealerships. Nicolo also proposed that the Pride dealerships obtain their wholesale inventory financing (also known as floor plan financing) from CFC. In contrast to the retail financing agreements, such wholesale financing agreements provide capital directly to the dealerships so that they can purchase their inventory of automobiles. Dos Anjos testified that he was told by CFC's Zone Manager for Boston, William Harrington, that in exchange for Pride's wholesale financing business, CFC would purchase 100%

of the installment contracts generated by Pride's customers. Harrington was apparently responsible for CFC's retail paper business in Boston. Nicolo testified that he, and not Harrington, was centrally involved in the contract negotiations between CFC and Dos Anjos in 1994 and that he had not had discussions with Dos Anjos about how many installment contracts CFC would purchase.

In 1995 and 1996, Dos Anjos transferred both the retail and wholesale financing of the four plaintiff dealerships to CFC in a series of agreements. First, on January 26, 1995, Dos Anjos transferred both the wholesale and retail financing for Blackstone Subaru to CFC. He did the same for the Pride Dodge dealership one month later. A little over a year later, on April 29, 1996, Dos Anjos entered into a retail financing agreement (but not a wholesale financing agreement) with CFC for the Pride Hyundai dealership. On August 29, 1996, four months later, Dos Anjos transferred to CFC the wholesale financing for Pride Chrysler-Plymouth and Pride Hyundai, both of which already had retail financing agreements with CFC.[1] Additionally, at some point unspecified in the record, but prior to 1999, Dos Anjos and CFC also entered into wholesale financing agreements for two other

---

[1]The delay in transferring the wholesale financing of these two dealerships to CFC was the result of problems with the dealerships' previous wholesale financier, Bay Bank. Bay Bank refused to release its first priority security interest in the two dealerships' assets because of an ongoing dispute.

dealerships, Pride Ford and Pride Kia, which are not parties to this action.

The parties agree that each of the retail financing agreements for the dealerships were the same in all material respects. Thus, as best we can tell from the record, a separate charge-back account existed for each of the Pride dealerships. Both parties admit that at least until 2000, CFC did not enforce the requirement that these accounts be maintained at 1.5% of the value of the outstanding installment contracts, which would have been substantially larger than the $1,000 minimum balance.

Unlike the retail financing contracts, each of the wholesale financing contracts -- which are all identical -- contains a sweeping security provision known as a dragnet clause. This clause provides:

> 3.0 **Security** - Debtor hereby grants to Secured Party a first and prior security interest in and to each and every Vehicle financed hereunder . . . . The security interest hereby granted shall secure the prompt, timely and full payment of (1) all Advances, (2) all interest accrued thereon in accordance with the terms of this Agreement and the Promissory Notes, (3) all other indebtedness and obligations of Debtor under the Promissory Notes, (4) all costs and expenses incurred by Secured Party in the collection or enforcement of the Promissory Notes or of the obligations of the Debtor under this Agreement, (5) all monies advanced by Secured Party on behalf of Debtor for taxes, levies, insurance and repairs to and maintenance of any Vehicle or other collateral, and (6) each and every other indebtedness or obligation now or hereafter owing by Debtor to Secured Party including any collection or enforcement costs and expenses or monies advanced on behalf of Debtor in connection with any such other indebtedness or obligations.

(emphasis added).  CFC apparently includes such dragnet clauses in all of its wholesale financing agreements.  Indeed, when one of Dos Anjos's assistants, the general manager of Blackstone Subaru, asked about changing some terms in the wholesale financing agreement, he was informed that CFC would not modify any portion of the contract because it was a standard lending document used with all dealers.

Under the literal language of this dragnet clause in the wholesale financing agreements, all of Pride's obligations to CFC, including those under the retail financing agreements, are secured by virtually all of Pride's assets.[2]  Moreover, this security interest applies not only to past obligations, but also to all subsequent obligations as well (including future obligations that might arise under then-unsigned retail financing agreements).  If applied in this way, the effect of the dragnet clause would be to alter the balance in the retail financing agreements, which do not themselves create a security interest in the dealer's assets apart from the minimum reserve balances in the charge-back accounts.  It was the industry norm then that the terms of retail financing

---

[2]The security interest included not only all of Pride's vehicles purchased with funds from the wholesale financing agreement, but also "all Chattel paper, Accounts whether or not earned by performance and including without limitation all amounts due from the manufacturer or distributor of the Vehicles or any of its subsidiaries or affiliates, Contract Rights, Documents, Instruments, General Intangibles, Consumer Goods, Inventory of Automotive Parts, Accessories and Supplies, Equipment, Furniture, Fixtures, Machinery, Tools, and Leasehold Improvements . . . ."

agreements did not provide for a security interest in the dealership's assets.

If CFC had not also been Pride's retail finance provider (and entered into no other financing contracts with Pride) the dragnet clause would likely have been irrelevant. But because CFC provided Pride with retail financing, the literal language of the dragnet clause created a new dynamic between the parties. It was possible for Pride to incur obligations, in the form of charge-backs, under the retail financing agreements that now were secured by virtually all of Pride's assets, not just the sum in the charge-back accounts created by the retail financing agreements. If read that way, the dragnet clause would have the effect of reducing Pride's flexibility in changing the supplier of its wholesale financing so long as there were outstanding installment contracts from which future liabilities might arise.

The business relationship between CFC and Pride was generally harmonious until October 1997; CFC purchased most, but not all, of Pride's installment contracts until that time. But it appears that CFC had been suffering significant losses in its retail paper business, and in October it replaced Harrington with a new Zone Manager for Boston, Robert DiClemente.

From the start of his tenure, DiClemente purchased significantly less retail paper from Pride than had his predecessor. Pride says that this, in turn, limited its ability to

sell cars and led to significant losses. Pride says that at least partially as a result of these losses, it defaulted on its various financing agreements with CFC. Pride thus entered into a new agreement with CFC on March 15, 1999, in which Pride agreed, inter alia, to release CFC from any liability arising up to that point[3] in exchange for CFC's agreement not to exercise its various rights arising from Pride's default.

Around the same time that it entered into the refinancing agreement with CFC, Dos Anjos began to seek new wholesale financing for two of his dealerships, Pride Ford and Pride Kia, neither of which is a party here. Dos Anjos began negotiating with Ford Motor Credit Company (FMCC), and on July 26, 1999, wrote to CFC asking it to release its security interests in the two dealerships' assets, which CFC retained in connection with those dealerships' wholesale financing agreements. FMCC would not provide the Pride Ford and Pride Kia dealerships with wholesale financing without a release of CFC's security interest in their assets. CFC, in turn, responded that it would only release those security interests in exchange for a $50,000 deposit into Pride Dodge's charge-back account, which would secure any of Pride's liability arising from potential future charge-backs in connection with the installment contracts that CFC

---

[3]The district court found that this release was enforceable and thus did not consider any of Pride's claims to the extent that they relied on conduct that occurred prior to the release. Pride does not appeal this ruling.

-11-

purchased from the two dealerships.  After some negotiation, Pride finally agreed to CFC's terms and paid the $50,000.  CFC, in turn, released its security interests in the two dealerships' assets and FMCC became the primary wholesale and retail financier for Pride Ford and Pride Kia.

The already deteriorating relationship between Pride and CFC was further jeopardized in 1999 when Pride discovered that CFC had been incorrectly calculating the amount of the charge-backs that Pride owed under the retail financing agreements.  After examining Pride's concerns, CFC officials agreed that it had been over-charging Pride on the charge-backs, although the cumulative amount of these over-charges was apparently a matter of some dispute within CFC.  In June of 2000, Pride and CFC negotiated a resolution of the dispute in which CFC credited a total of $276,680.31 to Pride's various charge-back accounts.  Apparently, DiClemente was able to convince other CFC officials to resolve the charge-back dispute on these terms in order to preserve CFC's relationship with Pride.

Despite the resolution of the charge-back dispute, Pride decided that it no longer wanted to maintain its wholesale financing relationship with CFC and began to search for another lender.[4]  Because potential new lenders would require a first-

_____

[4]Pride began negotiating with Manufacturers and Traders Trust Company (M&T), but these negotiations ultimately stalled when CFC would not release its security interest.  When M&T and Pride were

-12-

position security interest in Pride's assets before they would extend wholesale financing, Pride contacted CFC to negotiate the release of its security interest. DiClemente responded with a phone call to Matthew Ferucci, Pride's comptroller and executive manager, in which he expressed outrage that Pride would terminate its relationship with CFC immediately after CFC had agreed to credit Pride approximately $275,000. DiClemente stated that CFC would not release its security interest unless Pride deposited 3% of the value of the outstanding installment contracts in the various dealerships' charge-back accounts and threatened that he would start to purchase fewer of Pride's installment contracts. Ferucci responded by asking which provision of the wholesale contract authorized CFC to require such a deposit as a precondition to releasing its security interest.

About a month after DiClemente's phone call to Ferucci, on January 18, 2001, CFC's attorney sent a letter to Pride informing it that CFC would require Pride to deposit 1.5%, rather than 3%, of the value of the outstanding installment contracts in the accounts before CFC would agree to release its security interest in Pride's assets. This amounted to $415,569. The letter asserted that CFC was entitled to require such a deposit because its security interest, contained in the wholesale financing

unable to reach agreement, Pride agreed to pay M&T approximately $2,900 in attorneys' fees expended by M&T on the matter.

-13-

agreements' dragnet clause, covered not only Pride's wholesale liabilities, but also Pride's contingent liabilities arising out of the retail financing agreements.

Over the course of the next few months, Pride and CFC attempted to negotiate a settlement of their dispute. As the negotiations stalled, Pride intentionally defaulted on several of its contractual obligations under the wholesale financing agreements in order to express its displeasure with CFC. Pride did not provide CFC with monthly financing statements, did not attempt to resolve Pride's working capital or net worth shortages, and refused CFC access to its dealerships' books and records. CFC, contractually entitled to terminate immediately its wholesale financing of Pride, nonetheless decided to try to resolve the dispute through further negotiations. At a meeting in June 2001, Pride, through Dos Anjos, offered to deposit one million dollars into an account controlled by CFC in exchange for the release of the security interest, so long as CFC paid interest on the deposit. CFC refused this offer, claiming that it was not authorized to pay interest to its debtors. Dos Anjos, in turn, refused to cure Pride's defaults under the wholesale financing agreements.

Negotiations continued, but to little avail. Pride offered, on June 13, 2001, to begin providing CFC with monthly financing statements if CFC would calculate the actual amount of exposure on the charge-backs and would agree to a letter of credit

instead of cash in exchange for the release of the security agreements. CFC responded on June 15 by expressing its willingness to consider a letter of credit in lieu of cash, refusing to perform any actual calculation of retail charge-back exposure, and noting that Pride would still be in default of several provisions in the wholesale financing agreements even were it to resume providing CFC with monthly financing statements.

On August 9, 2001, Pride filed suit against CFC in Rhode Island Superior Court. CFC promptly removed the case to federal court. On November 14, 2002, CFC sent a letter to Pride in which it suggested that it would "freeze" $250,000 of Pride's money contained in an account held by CFC, which could be used to satisfy any liability of Pride during the pendency of the litigation. CFC, in turn, offered to continue providing Pride with wholesale financing during the litigation, despite Pride's defaults, and to "allow the Pride entities a period of time within which to replace its [sic] wholesale credit facilities." Pride ultimately agreed to this arrangement after negotiating terms to ensure it preserved its litigation rights. It then amended its complaint, pursuant to Fed. R. Civ. P. 15(b), to include CFC's conduct in the November 14, 2002 letter.

Pride's suit alleged that CFC had (1) violated the covenant of good faith and fair dealing; (2) tortiously interfered with prospective contractual relationships; and (3) violated Mass.

-15-

Gen. Laws ch. 93A. Pride also sought a declaration from the district court that CFC was not entitled to insist on a deposit of 1.5% of the value of the outstanding installment contracts because the dragnet clause in the wholesale financing agreements does not secure the liability that might arise out of future charge-backs. Although Pride admitted that its only monetary loss was the $2,900 that it paid to M&T, see supra note 4, it also sought attorneys' fees under Chapter 93A. See Mass. Gen. Laws ch. 93A, § 11. CFC counter-claimed, also seeking declaratory relief on the existence of a security interest in Pride's contingent liabilities from the retail financing agreements. CFC further claimed that it was entitled to attorneys' fees under the wholesale financing agreements.

A bench trial was held between March 24, 2003 and April 2, 2003. On May 29, 2003, the district court issued an opinion in which it rejected each of Pride's claims.[5] The opinion also granted CFC declaratory relief, finding that the dragnet clause in the wholesale financing agreements does apply to the contingent liabilities arising out of both past and future retail financing agreements and thus that CFC is entitled to insist on 1.5% of the value of the outstanding installment contracts as a condition

---

[5]Pride does not appeal the district court's decision regarding the tortious interference with prospective contractual relations claim.

precedent to releasing its security interest in Pride's assets.[6]

Applying Massachusetts law, the court determined that Pride's

obligations under the wholesale financing agreements are similar in

kind to its obligations under the retail financing agreements and

thus that the dragnet clause in the former was intended to secure

the obligations arising out of the latter.

**II.**

A. The Dragnet Clause

Both Pride and CFC agree with the district court's

holding that Massachusetts law applies to determine the scope of

the dragnet clause in the wholesale financing agreements.[7] Because

the contract interpretation issues we address are purely questions

of law, and there is no factual dispute, our review is de novo.

Coady v. Ashcraft & Gerel, 223 F.3d 1, 10 (1st Cir. 2000).

---

[6]The district court deferred ruling on the availability of
attorney's fees for the defendant until the conclusion of this
appeal.

[7]The analysis would be the same, however, even were we guided
by Rhode Island law, the other potential source of law. This is
because Rhode Island, like Massachusetts (and every other state),
recently adopted the revised provisions of Article Nine on which we
rely for our analysis. Compare Mass. Gen. Laws ch. 106, § 9-204,
with R.I. Gen. Laws § 6A-9-204.

-17-

<u>1.  The Law Applicable to Dragnet Clauses in Massachusetts</u>

Article Nine of the Uniform Commercial Code, as adopted by Massachusetts prior to 2001,[8] specifically permitted the use of dragnet clauses.  Mass. Gen. Laws ch. 106, § 9-204(c) (1979) (amended 2001) ("Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment as defined in subsection (1) of section 9-105.").

On July 1, 2001, a revised version of Article Nine of the Uniform Commercial Code became effective in Massachusetts.  It has since been adopted by all fifty states.  Kenneth Misken, <u>Survey of Legislation: Revised Article 9</u>, 24 U. Ark. Little Rock L. Rev. 415, 415 (2002).  It is this revised version of Article Nine that applies to the interpretation of the dragnet clause at issue here: suit was filed in this case on August 9, 2001, more than a month after the revised Article Nine became effective.  <u>See</u> Mass. Gen. Laws ch. 106, § 9-702(a) & (c) (the Act "applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before this act takes effect" unless, inter

---

[8]The Uniform Commercial Code was first adopted by Massachusetts in 1957.  <u>See</u> Mass. Gen. Laws ch. 106, § 1-101. A revised version of Article Nine that contained a provision authorizing dragnet clauses was adopted in 1979.  <u>See</u> Mass. Gen. Laws ch. 106, § 9-204 (1979) (amended 2001).

alia, the "action, case, or proceeding commenced before th[e] act takes effect").

The revised version of Article Nine includes two significant changes for purposes of this case. First, and more generally, it alters the meaning of the duty of good faith in the Article Nine context. Nat'l Conference of Comm'rs on Unif. State Laws, Uniform Commercial Code Revised Article 9 Secured Transactions § 9-102, cmt. 19 (1998) (hereinafter "U.C.C."). Previously, the applicable definition was contained in § 1-201(19), which only imposes on parties a duty of "honesty in fact in the conduct or transaction concerned." Mass. Gen. Laws ch. 106, § 1-201(19). The amendments provide that for Article Nine purposes, "[g]ood faith means honesty in fact and the observance of reasonable commercial standards of fair dealing." Id. § 9-102(43). Naturally, there has been controversy over this new standard. Cf. R. Wilson Freyermuth, Enforcement of Acceleration Provisions and the Rhetoric of Good Faith, 1998 BYU L. Rev. 1035, 1064 n.84 (discussing the controversy surrounding the broadening of the definition of good faith in Articles 3, 4 and 4A in 1990).

Second, the amendments include a modified version of § 9-204, the provision that deals with dragnet clauses. Like its predecessor, the revised § 9-204 explicitly permits the use of dragnet clauses, stating that "[a] security agreement may provide that collateral secures . . . future advances or other value,

-19-

whether or not the advances or value are given pursuant to commitment." Mass. Gen. Laws ch. 106, § 9-204 (2001); see U.C.C., § 9-204, cmt. 5 ("Under subsection (c) collateral may secure future as well as past or present advances if the security agreement so provides.").

Although the language of § 9-204 was only slightly modified by the 2001 amendments, the Official Commentary to the provision was substantially changed. It now provides:

> Determining the obligations secured by collateral is solely a matter of construing the parties' agreement under applicable law. This Article rejects the holdings of cases decided under former Article 9 that applied other tests, such as whether a future advance or other subsequently incurred obligation was of the same or a similar type or class as earlier advances and obligations secured by the collateral.

Id. § 9-204, cmt. 5 (emphasis added). As in most states, this Official Comment was not enacted into law by Massachusetts. See 2001 Mass. Adv. Legis. Serv. 26, § 39. For this reason, it does not enjoy the same status as does the text of § 9-204. See Szabo v. Vinton Motors, Inc., 630 F.2d 1, 4 (1st Cir. 1980) (interpreting Massachusetts law and noting that although the Official Comments "are powerful dicta. . . . it is the Code provisions and not the Comments which control" (internal quotation marks and citation omitted)); Consol. Film Indus. v. United States, 547 F.2d 533, 536 (10th Cir. 1977) ("We are unwilling to follow the Comment in preference to the words of the statute and particularly so in view of the fact that Utah has not chosen to adopt it."). And as Pride

-20-

observes in its supplemental briefing, the changed language of the amended § 9-204 does not appear materially different from its previous version.[9]

Most states, including Massachusetts, choose not to enact the Official Commentary to Code provisions such as Article Nine. See 1 E.A. Farnsworth, Farnsworth on Contracts § 1.9. (3d ed. 2004) (observing that most states do not enact the Official Commentary to the Code into law); see also Contrail Leasing Partners, Ltd. v. Consol. Airways, Inc., 742 F.2d 1095, 1101 (7th Cir. 1984) (noting that Indiana has not enacted the Official Commentary into law, but Arkansas has). The majority approach nonetheless tends to give "considerable weight to the comments." 1 Farnsworth, supra, § 1.9a; see also JOM, Inc. v. Adell Plastics, Inc., 193 F.3d 47, 57 n.6 (1st Cir. 1999) ("UCC Official Comments do not have the force of law, but are nonetheless the most useful of several aids to interpretation and construction of the [UCC]." (internal quotation marks omitted)). The SJC follows this majority viewpoint, routinely treating Official Comments to the Code that have not been enacted as highly persuasive authority. See, e.g., Commerce &

---

[9]Pride, relying on one commentator, urges in its supplemental briefing that "the best approach is to disregard Comment 5 to Revised Section 9-204 as unsupported by the statutory text of that provision" because otherwise "the pressure will be on the courts to find equity doctrines to limit the exalted position of the secured creditor under Revised Article 9." Secured Transactions Under the UCC § 7C.04[3] (Matthew Bender 2003). For the reasons that follow, we reject this position.

Indus. Ins. Co. v. Bayer Corp., 433 Mass. 388, 394-96 (2001); Lafayette Place Assocs. v. Boston Redevelopment Auth., 427 Mass. 509, 525-26 (1998); Chokel v. First Nat'l Supermarkets, 421 Mass. 631, 638-39 (1996); Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 292-93 (1980). The Official Commentary here was made widely available prior to the state's enactment of the Code: the revised Article Nine, along with the Official Commentary, was published three years prior to its adoption in Massachusetts.

Use of the Official Comment here would mean that the Massachusetts cases analyzing dragnet clauses -- all of which consider real estate mortgages, where Article Nine does not apply,[10] see Mass. Gen. Laws ch. 106, § 9-204(c) -- are inapplicable in the Article Nine context. These real estate cases have specifically used the approach repudiated by the Official Comment, construing dragnet clauses "to apply to only debts of the general kind of those specifically secured, or which bear a sufficiently close relationship to the original indebtedness, that the [c]onsent of the debtor can be inferred." Foxborough Savings Bank v. Ballarino, 180 B.R. 343, 346-47 (D. Mass. 1995) (internal quotations and

---

[10]For this reason, the Massachusetts cases on dragnet clauses were not themselves directly affected by the amended Massachusetts Commercial Code. See Safe Deposit Bank & Trust Co. v. Berman, 393 F.2d 401, 403 (1st Cir. 1968) (noting that "Massachusetts law has shown itself sensitive to" certain considerations in the real estate mortgage context, "[b]ut in this case we deal with the Uniform Commercial Code and must look to its terms and spirit for guidance").

citations omitted) (quoting <u>Financial Acceptance Corp.</u> v. <u>Garvey</u>, 6 Mass. App. Ct. 610, 613 (1978)); <u>see</u> <u>In re Goodman Indus.</u>, 21 B.R. 512, 516 (Bankr. D. Mass. 1982); <u>Debral Realty, Inc.</u> v. <u>Marlborough Coop. Bank</u>, 48 Mass. App. Ct. 92, 94-95 (1999). Although these cases interpreted dragnet clauses contained in mortgages of real property, some courts elsewhere, but not in Massachusetts, had found that similar principles applied in the Article Nine context. <u>See, e.g.</u>, <u>In re Kazmierczak</u>, 24 F.3d 1020, 1022 (7th Cir. 1994); <u>In re Estate of Simpson</u>, 403 N.W.2d 791, 792-93 (Iowa 1987); <u>In re Johnson</u>, 9 B.R. 713, 716 (Bankr. M.D. Tenn. 1981).

Ultimately, our role in this diversity case is to predict what the Massachusetts Supreme Judicial Court would do if it were faced with this issue. <u>See</u> <u>In re Mi-lor Corp.</u>, 348 F.3d 294, 305-06 (1st Cir. 2003). We think that the SJC would adopt the approach to dragnet clauses in the Article Nine context that is contained in the Official Commentary to the revised Code. The parties in transactions involving dragnet clauses are typically sophisticated market actors. Commercial parties on both sides of a transaction may have good reasons to enter into a security agreement that secures not only present liabilities, but also future liabilities of a different class or type. Such an arrangement allows future credit to be extended between the parties on a secured basis without the additional transaction costs that would accompany the

execution of a new agreement for each such transaction. See 2 Clark, The Law of Secured Transactions under the Uniform Commercial Code § 10.01[3] (2000) ("Article 9 makes it clear that [future] advances become part of the obligation secured by the collateral without the necessity of new security agreements accompanying the future advances.").

Additionally, the approach set forth in the Official Commentary provides the benefit of greater certainty to sophisticated commercial actors about the circumstances in which dragnet clauses will be enforced. One of the primary shortcomings of comparing types of debt is that the inquiry is inherently uncertain. See Campbell, supra, at 1040. Commercial parties place considerable value on having a clear set of legal background rules against which to order their affairs. See Robert E. Scott, A Relational Theory of Default Rules for Commercial Contracts, 19 J. Legal Stud. 597, 598 (1990). And the Code itself says that it should be construed according to its underlying purposes and policies, one of which is "to simplify, clarify and modernize the law governing commercial transactions." Mass. Gen. Laws ch. 106, § 1-102.

Massachusetts may also view the amendment to § 9-204 and the approach articulated in the Official Commentary to work in tandem with Article Nine's expanded definition of good faith. The risk that creditors may abuse broad dragnet clauses is offset by

the expansion of the duty of good faith to include a standard of commercial reasonableness.[11]

Given the approach advocated in the Official Commentary to the code, the competing policy considerations, the code's expanded definition of good faith, and the fact that the Massachusetts cases interpreting dragnet clauses in real estate mortgages do not apply Article Nine and were decided before the 2001 amendment, we think it reasonably clear that the Massachusetts SJC would not make enforcement of dragnet clauses in the Article Nine context vary according to the similarity of the types of obligations at issue. Instead, as the Official Commentary puts it, Massachusetts would simply "construe the parties' agreement under applicable law."

### 2. Interpreting the Parties' Agreement

The applicable law for construing the parties' agreement is the Massachusetts Commercial Code, in particular Articles One (general provisions) and Nine, see 1 Farnsworth, supra, § 1.9a (Article One applies whenever another Article of the code applies),

---

[11]This new requirement at least partially mitigates the concern of one commentator that the approach in the Official Commentary does not "protect debtors from 'surprise' security agreements where the circumstances suggest that the debtor did not really consent to the interest." Secured Transactions Under the UCC, supra, § 2.04. To the extent that the scope of a security agreement is a "surprise" to a debtor because of commercially unreasonable actions taken by the creditor, then the dragnet clause may be limited by operation of the duty of good faith rather than an artificial and unpredictable requirement of relatedness.

as well as background Massachusetts principles of contract interpretation.

The usual rule in Massachusetts is that "where the wording of the contract is unambiguous, the contract must be enforced according to its terms." Liberty Mut. Ins. Co. v. Gibbs, 773 F.2d 15, 17 (1st Cir. 1985) (internal quotation marks omitted); see Boston Edison Co. v. Fed. Energy Regulatory Comm'n, 856 F.2d 361, 365 (1st Cir. 1988). The language used in the dragnet clause here is unambiguous: all future and past debts, without exception, are secured under the plain meaning of the clause's terms. Cf. In re Conte, 206 F.3d 536, 538-39 (5th Cir. 2000) (applying Texas law and concluding that the text of a dragnet clause is unambiguous).

Pride argues that it did not subjectively intend the dragnet clause to cover the retail finance agreements, and so the clause cannot do so. Dos Anjos testified that he would never have entered into the wholesale financing agreements if he believed that they secured debts arising out of the retail financing agreements. But the language of the dragnet clause is plain, and trumps Dos Anjos's testimony. Unless the written agreement is somehow uncertain or equivocal, evidence of subjective intent cannot alter its plain meaning. ITT Corp. v. LTX Corp., 926 F.2d 1258, 1264 (1st Cir. 1991) (applying Massachusetts law); Commercial Union Ins. Co. v. Walbrook Ins. Co., 7 F.3d 1047, 1052 (1st Cir. 1993) (same).

More relevant is Pride's argument that its course of dealing with CFC, as well as industry custom, established that neither party expected that the security interest in the dragnet clause would cover the contingent charge-back liabilities. Pride points out that its retail financing agreements with CFC, some of which Pride entered into prior to the execution of the wholesale financing agreements, never required any security interest for the contingent liabilities that might arise thereunder, and that this practice is the industry norm. Massachusetts law provides that "[t]he express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade." Mass. Gen. Laws ch. 106, § 1-205.

Ultimately this argument goes nowhere because on the evidence there is no tension among the parties' course of dealing, industry norms, and the express terms of the dragnet clause. The parties' relationship was fundamentally changed when they entered into a wholesale financing relationship. Once the major debt between CFC and Pride -- that arising out of the wholesale financing agreements -- was placed on a secured basis, it was reasonable for the parties to agree that all of the debts arising out of their future dealings would also be secured. This

-27-

arrangement would facilitate future lending between the parties by assuring that such lending would also occur on a secured basis.

Nevertheless, that does not end the matter. We must still determine whether applying the dragnet clause would violate the duty of good faith, which now includes a requirement of "reasonable commercial standards of fair dealing." Mass. Gen. Laws ch. 106, § 9-102(43). Although Pride argues that applying the dragnet clause here would violate public policy, in substance Pride's claim is one of "reasonable commercial standards of fair dealing" that fits with the revised Article Nine's duty of good faith. The argument is that applying the dragnet clause in the wholesale financing agreements to the contingent charge-back liabilities would effectively stymie Pride's ability to switch from CFC to a new wholesale lender. Pride's potential charge-back liability lasts until every retail installment contract is paid in full, which can take up to seven years from the time the automobile consumer enters into the contract with the dealership. If CFC maintained a first position security interest in all of Pride's assets for this contingent debt, Pride says, then Pride would be unable to switch wholesale lenders until all of the installment contracts were completed. This is because the practice of virtually all lenders is to require a first-position security interest in a dealership's assets before they will provide

-28-

wholesale financing, and CFC would possess that interest to secure the payment of uncertain future liabilities.

The problem with this argument is that Pride could have negotiated with CFC a commercially reasonable arrangement to release its first-position security interest in Pride's assets. As the facts of this case amply demonstrate, all Pride had to do was to offer CFC sufficient assurances of payment of the contingent liabilities in order to get CFC to release its first position security interest. CFC was willing to release its security interest in Pride's assets, and thus allow Pride to find new wholesale financing, if Pride posted 1.5% of the value of the outstanding installment contracts in an account controlled by CFC. Indeed, that is precisely the type of arrangement that the parties came to when Pride switched to FMCC for the wholesale financing of Pride Ford and Pride Kia.[12]

Pride's response is that this resolution is commercially unreasonable because it gives the lender, here CFC, all of the negotiating leverage in the determination of what exactly constitutes adequate assurances of payment. For instance, Pride

---

[12]There was some testimony at trial that the $50,000 deposit Pride made in connection with CFC's release of its security interest in Pride Kia's and Pride Ford's assets was actually more than 1.5% of the value of the outstanding installment contracts for those two dealerships.

insists that CFC's request that it post 1.5% of the value of the outstanding installment contracts was unreasonable.[13]

This argument is unavailing. To the extent that such leverage might allow a lender to insist on unreasonably high assurances of payment for the contingent liabilities -- assurances that are, perhaps, designed to thwart a dealership's ability to find a new wholesale lender -- the duty of good faith and statutory regimes such as Chapter 93A would apply. See Mass. Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995). But to the extent that the lender is simply in a more favorable bargaining position than the dealership to insist on full protection for the payment of the contingent liabilities, that is a result of the parties' agreement. Here, there was no evidence that CFC's requirement that Pride deposit 1.5% of the value of the outstanding installment contracts was unreasonable. The district court found, to the contrary, that this demand was perfectly reasonable. That finding flowed naturally from the fact that the retail financing agreements provided that Pride was supposed to have deposited 1.5% of the value of the installment contracts in a charge-back account when those contracts were purchased. The fact that this requirement was never previously enforced does not undercut its value as evidence that the 1.5% requirement was eminently

---

[13]CFC first insisted on 3% of the value of the outstanding contingent liabilities and then retreated to 1.5%.

reasonable.  Whether enforced or not, Pride had agreed to the 1.5% figure well before it found itself in a less favorable bargaining position.

Of course, a particular application of a dragnet clause might violate a state's public policy even if the clause were commercially reasonable.  See, e.g., Cont'l Grain Co. v. Beasley, 628 So. 2d 319, 322 (Ala. 1993) (public policy against use of predispute arbitration agreements).  And, in fact, Massachusetts has, by statute, extended special solicitude to car dealerships.  See Mass. Gen. Laws ch. 93B.  But that solicitude does not reach this far.  Section 9-204 of the Massachusetts code makes it obvious that the concept of a dragnet clause does not on its face violate public policy, and nothing in Chapter 93B alters this result in the automobile dealership context.

Given the clear and unambiguous language of the dragnet clause in the wholesale financing agreements, the lack of any evidence of a violation of the duty of good faith, and the absence of other special circumstances rendering such an interpretation unreasonable or against public policy, we hold that the dragnet clause did apply to the contingent debt arising out of the retail financing agreements.

B.  Pride's Other Claims

Pride also appeals the district court's related order that it deposit 1.5% of the unpaid balance of all outstanding

installment contracts in an account controlled by CFC. Pride's argument is that CFC was entitled to withhold 1.5% of the price of each installment contract at the time it purchased the contract from Pride. By failing to avail itself of this right when it purchased the installment contracts, Pride says that CFC waived the right. Pride's waiver argument ignores the likelihood that CFC may have thought that its security under the dragnet clause did not require it to enforce the minimum balance requirement unless conditions changed.

In any event, as the district court rightly held, the source of CFC's right to insist on a 1.5% deposit was never claimed to be any provision of the retail financing agreements, but instead stemmed from CFC's security interest via the dragnet clause. By demanding a 1.5% deposit, CFC was simply requiring that Pride post a sum of money to secure potential charge-back liability before it was willing to release its security interest.

The other claim that Pride presses on appeal is that CFC violated Chapter 93A in multiple respects, most notably by refusing to release its security interest before Pride posted 1.5% of the value of the outstanding installment contracts. This argument, once again, is largely resolved by our holding that the dragnet clause applied to the outstanding contingent liabilities. CFC had every right to insist on reasonable assurances that these liabilities would be paid before it released its security interest

in Pride's assets. However, CFC was not free to insist on unreasonably high deposits as a pre-condition to releasing its security interest, especially if it was doing so as a method of locking in its wholesale financing of Pride. Here, though, we have already concluded that the requirement of a 1.5% deposit of the value of the outstanding installment contracts was not unreasonable.

We also reject Pride's argument that CFC violated Chapter 93A by its conduct during the pendency of this litigation. Pride says that in a letter dated November 14, 2002, CFC threatened to terminate Pride's wholesale financing unless it executed new retail and wholesale financing agreements. The district court found that this letter "simply acknowledged that Pride has refused to sign CFC's new wholesale contracts . . . and presented Pride with various alternatives to resolve the conflicts between the parties." The district court concluded that this conduct was not "unscrupulous, oppressive, or deceitful," and Pride once again offers no reason for us to question this conclusion.

### III.

The judgment against Pride is **affirmed**; Pride's contingent obligations under the retail financing agreements are secured by the dragnet clause in the wholesale financing agreements. CFC did not violate Mass. Gen. Laws ch. 93A and was entitled to require that Pride deposit 1.5% of the value of the

outstanding installment contracts as a condition of releasing its first-position security interest in Pride's assets.

Costs are awarded to CFC.  So ordered.